[No. B218687. Second Dist., Div. Six. Mar. 2, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID THOMAS POWERS, Defendant and Appellant.

COUNSEL

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

YEGAN, J.—An employee who listens to consumer complaints should have a thick skin. He or she might reasonably expect to hear complaints just like the ones in this case, i.e., complaints laced with references to bovine excrement, body parts and other vulgarities derived from sexually related terms. If the complaint is by telephone, the call recipient can be a crime victim (Pen. Code, § 653m, subd. (a)).[1] Alternatively, the caller may not threaten to inflict injury on the employee or use obscene language lewdly. Here, appellant made annoying telephone calls to a customer comment line using an abundance of vulgarities derived from sexually related terms, but not lewdly. He did not threaten to harm the recipient of his consumer complaints. Thus, as we shall explain, he did not violate section 653m, subdivision (a).

David Thomas Powers was convicted in a court trial of four misdemeanor counts of making annoying telephone calls to a customer comment telephone line maintained by the corporate office of Cold Stone Creamery. The trial court placed appellant on probation, ordered him to serve 540 days in county jail, with credit for 225 days of actual custody and 110 conduct credits, and ordered him to pay certain fines.

*Facts and Procedural History*

In the fall of 2008, appellant made frequent telephone calls to Cold Stone Creamery's customer service telephone line. The calls were not answered by a live person. Instead, appellant left lengthy recorded messages. In his calls, appellant says he was a devotee of Cold Stone Creamery and frequented the store for over a year before he started complaining. He calls himself a "big

---

[1] All statutory references are to this code unless otherwise stated.

customer" saying that he has gone to the store on approximately 400 occasions in a year. He always identifies himself by his full name and leaves a telephone number in the event that someone would like to discuss his complaints. His tone alternates between praise with laughter and belligerency using profanity. He is particularly fond of pumpkin-flavored ice cream. But in all of the messages, his theme is constant: he claims that he is being shorted, "ripped off," when he is buying a 48-ounce quantity of ice cream and is receiving less than that. He also complains that other customers in the store bother him. He has a penchant for the "F" word and says, "I have the right to complain." Not surprisingly, no one telephoned appellant to discuss his complaints. Instead, a complaint was made to the police.

In January 2009, appellant was charged with one felony count of making criminal threats against a Cold Stone Creamery employee (§ 422), and several misdemeanor counts of making annoying telephone calls to a Cold Stone Creamery employee. The trial court found appellant incompetent for trial and he was committed to a state hospital for treatment. After his competency was restored, the felony charge was dismissed. Appellant agreed to a court trial and stipulated that recordings and transcripts of his telephone messages could be admitted into evidence. Appellant testified in his own defense. After listening to the recordings, the trial court found appellant guilty of four misdemeanors, as alleged in counts 5, 6, 8 and 9 of the complaint.

### The Telephone Messages

Count 5 relates to the message appellant left about 1:00 a.m. on October 8, 2008. In the beginning of this message, he complains that the container of ice cream he bought was not completely full, but he also states that he "really enjoy[ed]" the employees at the store. Appellant states that he had complained to the police about getting ripped off, but they did not do anything. His experience at the store was "ninety-nine percent good," but other customers threatened him. They made "some pretty serious comments" and "if they don't let up . . . then I get around to some of my four-letter words . . . . I don't need any of their fuckin' bullshit. You know they're breaking some very, very serious laws and the police department over there, I guess they think it's cute."

Appellant states that "war's been waged" on him for years and the police have arrested him "over how I stood up to somebody who did nothin' but, uh, terrorize me, traumatize me, or uh, do their best to do that." He says that "sometimes in my life it's led to me to kill police officers and deputy sheriffs

and sometimes the clowns that work for the FBI . . . . I ever have problem with them and I'll take my fist and beat their faces in just like I would anybody else . . . ." If the police come to arrest appellant, "then I blow their brains out just like I would anybody else." He calls the other customers "trash" and wishes someone would "do somethin' about it." Appellant says that, if he gets more physically fit, he will "seriously just wage war on everybody with my fists. And they will not win. They've never won. They can't win. Like I said, I did all kinds of things in my life. One was—I was the world heavyweight champion in boxing for so many years that yeah, it didn't matter what name I used, I—I rarely used my real name," because he would get arrested by a police officer, "and I'd just wage war on his face. So good luck. Thank you very much."[2]

Count 6 relates to the message appellant recorded on October 27, 2008. In this shorter message appellant says, "I love your ice cream. I love everything about it. But every now and then, like I said, again tonight I got waited on and ripped off." He complains that he did not get all of the ice cream and "fixin's" he paid for. The staff was either "tellin' the truth or they're fuckin' lyin', you know, and I don't need to be patronized. And you know, I'm not bothered by it in the least, other than I'm gonna call you and keep tellin' you that nobody's done anything about the fact that I keep gettin' ripped off." Appellant also complains about other customers playing a game with him and threatening him. "And so I'm continuin' to tell 'em, 'fuck you.' And, if it's a man, I tell him he's got mother for a fuckin' slut. And I don't regret it and I'm not gonna apologize for it if your employees would stop rippin' me off or I'm gonna continue to tell the customers that threaten me, 'fuck you.' And, if they got a mother, she's a fuckin' slut. Thank you very much."

Count 8 relates to the message appellant left on November 30, 2008: "Cold Stone Creamery customers are supposed to do their job. They're not supposed to let people flounder and feel helpless and hopeless and worthless and then turn around and lash out or commit a crime somewhere and then show up and then show up tryin' to be people's heroes." Appellant complains that he was "ripped off" again because an employee did not give him the correct number of brownies with his order. He thought this happened because another employee was there with some of her friends and they were saying things like, "It's okay to rape women; it's okay to do this; their dads are police

---

[2] We do not read these statements as a threat to the recipient of the telephone call. The People did not introduce any evidence that the recipient felt threatened by this ranting. The fair import of the October 8, 2008 call is that "they," third persons, will have war waged upon "them." Moreover, this threat is conditioned on appellant's regaining physical fitness.

officers, they're [*sic*] older brothers, whatever. I couldn't care less. I'm just there to get my ice cream. I pay for it; I go on my way. I bring it home and eat it. I wouldn't be caught dead eatin' there, not with the kind of fuckin' trash that stands around on the customer side of the counter and makes the threats they do and nobody does anything about it." Appellant claims that the police department is "dirty, underhanded," and that police officers "will kill people, they will steal from people, and they will rape women and that's really wrong. So please try not to help that trash like Lizzie has and anybody else like Dennis and some of those other fuckin' assholes. Thank you very much."

Count 9 relates to the message appellant left on December 1, 2008. The tone of this call is similar to that of the November 30 message. Appellant again complains about other customers threatening him and influencing the way store employees prepare his ice cream. Appellant also complains that he got "ripped off" again because he did not get the number of brownies he paid for. He ended the call by saying, "Whoever's in charge over there is a real fuckin' asshole. So I got fuckin' ripped off again. So Cold Stone Creamery, fuck you and your fuckin' bullshit."

*Defense Testimony*

Appellant admitted having made the telephone calls. He testified that, in his first few telephone messages, he just wanted to tell the company that he liked the ice cream and the service he received. The company sent him some coupons for free ice cream, so he continued to call. "And then at some point I [(appellant)] decided to bring up, you know, the fact . . . they really didn't pack the ice cream in there for what I got. And that's when they took on a whole different attitude with me." Appellant testified that he was not making the calls to annoy or harass anyone. He acknowledged that he used inappropriate language but testified that "they just continued to threaten me and make me feel like there was no place that I could go to get help." He concluded with this statement: "I would like to say that I was doing everything that I could to positively encourage them, but to consider the fact that, yeah, if I wanted to call the company, why would that offend anybody[?] They were usually compliments but—I just didn't know what to do. Some of the comments reflected that I have two daughters that live down in La Habra. Some of the comments reflected that somehow they were going to mistreat my two daughters. This was all done subtly and indirectly. I just—I just didn't know what to do."

## Trial Court Decision

The trial court listened to the recordings and found appellant guilty on counts 5, 6, 8 and 9 of the complaint. It noted that appellant was "suffering from some mental health issues" when he made the phone calls, but concluded that "the tenor of the phone calls" and "the obscene language used," proved that appellant "must have [had] an intent to harass or annoy and [to] address obscene language to the persons who receive those phone calls." As we shall explain, even if this is a factual finding, it is at variance with controlling case law.[3]

## Discussion

Appellant contends the judgment must be reversed because there is no substantial evidence that he threatened the recipient of the telephone calls or that he used obscene language in a lewd manner. We agree.

Section 653m, subdivision (a) provides, "Every person who, with intent to annoy, telephones or makes contact by means of an electronic communication device with another and addresses to or about the other person any obscene language or addresses to the other person any threat to inflict injury to the person or property of the person addressed or any member of his or her family, is guilty of a misdemeanor. Nothing in this subdivision shall apply to telephone calls or electronic contacts made in good faith."

■ Like all penal statutes, section 653m must be "interpreted in light of the objective sought to be achieved, as well as the evil sought to be averted. [Citations.] ■ The purpose of section 653m is to deter people from making harassing telephone calls with the intent to annoy and thus, to secure an individual's right to privacy against unwanted intrusion." (*People v. Hernandez* (1991) 231 Cal.App.3d 1376, 1384 [283 Cal.Rptr. 81].) Because the "purpose of the statute [is] to protect an individual's right to privacy from annoying intrusions," the court in *Hernandez* held that a jury was properly instructed with the "common dictionary definition" of the term "obscene," rather than with the legal standard for obscenity adopted by the United States Supreme Court in cases such as *Roth v. United States* (1957) 354 U.S. 476 [1 L.Ed.2d 1498, 77 S.Ct. 1304], and *Miller v. California* (1973) 413 U.S. 15

---

[3] We too have listened to the recorded messages. This is one of those rare occasions when an appellate court reverses a judgment based on insufficient evidence. We agree with the trial court that these calls were annoying but this is not the determinative issue. The determinative issues are whether he annoyed the call recipient with threatening language and whether he annoyed the call recipient with obscenities used lewdly.

[37 L.Ed.2d 419, 93 S.Ct. 2607]. (*Hernandez,* at pp. 1384, 1383.) Thus, "obscene" may be defined for purposes of section 653m as language that is " 'offensive to one's feelings, or to prevailing notions of modesty or decency; lewd.' " (*People v. Hernandez, supra,* 231 Cal.App.3d at p. 1383, fn. 5.) It is not necessarily limited to language that deals "predominantly . . . with sex in a manner appealing to the prurient interest . . . ." (*Id.* at p. 1383.)

In *Hernandez,* the defendant made at least 80 telephone calls over a two-week period to the manager of an apartment complex. In many of the calls, he demanded that the manager relay messages to a tenant who had obtained a restraining order against the defendant. In other calls, the defendant was hostile and accusatory toward the apartment manager personally, telling her that she was "in deep trouble," and that she would "pay" if he went to jail. (*People v. Hernandez, supra,* 231 Cal.App.3d at p. 1380.) The defendant called several times a day, often hanging up immediately after the manager answered, or after calling her vulgar names including " 'fat bitch,' a 'whore,' and a 'c---'." (*People v. Hernandez, supra,* 231 Cal.App.3d at p. 1380, fn. 4.)

The repeated calls in *Hernandez* intruded on the privacy of a specific targeted individual. They featured threatening, angry and vulgar language that was intended to coerce the recipient into relaying messages the caller could not personally deliver. In that factual context, the court held that applying a broader definition of "obscene" was consistent with the "clear statutory concern for deterring annoying telephone calls. . . . The Legislature did not intend to deter intentional and annoying telephone calls containing 'obscene' language dealing with sex and appealing to the prurient interest . . . , while exempting equally annoying telephone calls containing language that would be considered 'obscene' under a common or dictionary definition." (*People v. Hernandez, supra,* 231 Cal.App.3d at p. 1384.) *Hernandez* also emphasized, however, that, "Even if appellant's words were *not* obscene under subdivision (a) of the statute, appellant's conduct still violated subdivision (a) since there was sufficient evidence that he threatened injury to [the apartment manager]. Subdivision (a) not only prohibits intentional and annoying phone calls using obscene language, but also intentionally annoying phone calls which threaten to inflict injury." (*Id.* at pp. 1386–1387.)

In *In re C.C.* (2009) 178 Cal.App.4th 915 [100 Cal.Rptr.3d 746], the court considered *Hernandez* in determining whether text messages, sent by a teenager to his former girlfriend, were "obscene" for purposes of section 653m. Even though the messages included repeated uses of common vulgarities derived from sexually related terms, the court held the messages were not

obscene because, "it is inappropriate to extract isolated words from a private message and impose *criminal* liability based on their abstract offensiveness." (178 Cal.App.4th at p. 920.) The court explained: "Although the [text messages] used vulgarities derived from sexually related terms . . . , those words were not used lewdly. They were expletives used as verbs and adjectives to emphasize the depth of [the defendant's] feelings, and in a couple of places as insults to describe how he felt about [the recipient] as a result of her conduct." (*Id.* at p. 921.) Read in context, as "words . . . used by an agitated, frustrated high school boy to his former high school girlfriend, [where] both parties to the communication attended a high school where such language is in common parlance," the messages could only reasonably be understood as insulting or upsetting, but not obscene. (*Id.* at p. 922.)

Factually, the instant case is more akin to the text messages at issue in *C.C.* and less akin to the menacing calls at issue in *Hernandez*. Appellant left annoying messages at a business, complaining about customer service. The calls were not private communications between former intimates, as in *C.C.*, but they also were not intrusive on the privacy of a specific targeted individual, as in *Hernandez*. Like the defendants in both of the above cases, appellant's messages included vulgar, sexually related terms. But appellant did not use those terms lewdly. Rather, they were "expletives used as verbs and adjectives to emphasize the depth" of appellant's frustration and anger, and "as insults to describe how he felt" about the service he received and the other customers at his local store. (*In re C.C., supra*, 178 Cal.App.4th at p. 921.) The dictionary definitions of these terms may be sexual in nature, but those definitions "may not reflect the meaning conveyed by those words as used in contemporary society." (*Id.* at p. 922.) To the extent that *People v. Hernandez* is at variance with *In re C.C.* we decline to follow it and believe that *C.C.* is the better reasoned opinion.

We conclude that the recordings appellant left on the customer service line cannot constitute substantial evidence that appellant violated section 653m, subdivision (a). The messages are annoying rants concerning customer service. It is reasonable for someone to be annoyed by appellant's language. But the vulgarities uttered cannot be described as obscene, especially in the context of a customer service line maintained to take complaints. Except in extreme cases, we doubt that a person whose job it is to receive consumer complaints has a right to privacy against unwanted intrusion. (See *People v. Hernandez, supra*, 231 Cal.App.3d at p. 1384.) Of course, the line can be crossed if and when the caller threatens injury and/or uses obscene language lewdly. Appellant did not cross the line.

## *Conclusion*

The judgment is reversed.

Gilbert, P. J., and Coffee, J., concurred.