Filed 3/8/21  P. v. Diop CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

NDIAWAR DIOP,

     Defendant and Appellant.

E073789

(Super.Ct.No. RIF1705383)

OPINION

APPEAL from the Superior Court of Riverside County.  Timothy J. Hollenhorst, Judge.  Affirmed.

Law Office of Zulu Ali & Associates. Zulu A. Ali and Whitney Ali for Defendant and Appellant.

Xavier Becerra, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

1

Ndiawar Diop, a licensed vocational nurse (LVN) at the California Institution for Men in Chino (Chino prison), appeals from a judgment after a jury convicted him of five counts of insurance fraud and one count of attempted perjury in connection with his workers' compensation claim. (Ins. Code, § 1871.4, subd. (a)(1), count 1; Pen. Code, §§ 550, subd. (b)(1), counts 2, 3, 4, 6; 664, 118a, count 5.) Defendant contends: (1) the evidence fails to support his convictions; (2) the trial court made many evidentiary errors; (3) the court erred in failing to unseal juror identification information; (4) the court erred in failing to instruct on the defense of mistake of fact; and (5) the court erred by denying his motion for new trial. We reject his contentions and affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

On June 4, 2013, while working at Chino prison, defendant provided insulin to inmate George Philpott. After Philpott injected himself, he returned the needle through an opening in a window. Defendant then placed the used needle into a container used for disposing of needles. Philpott observed defendant put his hand into the container and get poked. Defendant pulled his hand out and began squeezing his finger. Philpott called for a correctional officer to avoid getting in trouble. Upon seeing defendant prick himself, Philpott exclaimed, "'I have Hep C.'" Philpott admitted that he did not like defendant but claimed that he never attacked, injured, or threatened him. No disciplinary actions were taken against Philpott nor was any internal report regarding a staff assault prepared.

Following his injury, defendant went to a supervisor's office and told her that he "accidentally poked himself" with a "[d]irty [insulin] needle." Because he was injured on the job, the supervisor provided defendant with a workers' compensation claim form,

2

which he completed. The supervisor also completed an authorization for treatment form and sent defendant to urgent care. Defendant never said he was attacked by an inmate.

At U.S. HealthWorks, defendant was treated by a physician's assistant (PA), Marc Harvey. Defendant completed an intake form, stating, "After inmate injection of Lantus—I got poked by his needle on my R. index finger while taking the needle back from him." Harvey prepared a "New Patient Narrative" and stated: "35 y.o. [nurse] states while at work 2 hours ago administered insulin to an inmate with history of hep. C then accidentally punctured his right index finger with the contaminated needle. Patient feels very anxious and upset about the possibility of getting hep. C." Defendant never stated that he had been attacked by an inmate. He was treated for his finger injury, his blood was drawn and tested for any pathogen exposure, and he began receiving antiviral medication.

Seven months later, on January 13, 2014, defendant met psychologist Nelson Flores regarding his workers' compensation claim. He told Dr. Flores that an inmate at his work had "stabbed him with the syringe when returning" it; however, he never mentioned the inmate tried to stab him in the neck. On March 8, 2014, defendant saw psychiatrist Joseph Liu, a colleague of Dr. Flores, regarding his workers' compensation claim. He stated, "he was attacked while he was working [at] the Chino Prison." Dr. Liu diagnosed defendant as having "anxiety disorder NOS," meaning "he has some worry, frustrat[ion], some anxiety, but does not meet any specific anxiety disorder," and it is "not otherwise specific."

Dr. Flores saw defendant again on December 19, 2014, and defendant never revealed that the inmate tried to stab his neck. Defendant remained Dr. Flores's patient until February 16, 2017. On that day, Dr. Flores completed a final "comprehensive permanent and stationary psychological evaluation report," which was sent to defendant's primary treating physician and his attorney of record in his workers' compensation matter. Defendant maintained that "he was attacked by this inmate with a syringe"; however, for the first time, he claimed the inmate tried to stab him in the neck. Dr. Flores determined defendant suffered from posttraumatic stress disorder (PTSD). The doctor testified that a feature of PTSD is "an amnesic response," which is the inability to recall important aspects of the trauma. It may cause a patient "to avoid thinking about the traumatic event [and] forget . . . some of the important events that happened during the traumatic injury event."

On September 10, 2018, when Dr. Flores met with defendant regarding his workers' compensation claim at the request of defense counsel, defendant indicated he had been attacked by the inmate, but he did not say the inmate tried to stab him in the neck. And, for the first time, he "mentioned he moved his hands instinctively to protect himself." Dr. Flores reviewed defendant's May 21, 2015 deposition transcript, wherein he stated he had been "'attacked'" by the inmate. Dr. Flores also reviewed an October 1, 2015 final report prepared by defendant's primary physician, Dr. Pratley, wherein defendant stated that he "was administering an injection on an inmate, and that the inmate took the syringe, and he stabbed [defendant] in his right finger as he tried to cover and

4

block himself." Dr. Pratley's report did not contain any claim about an inmate stabbing defendant "in the neck."

The State Compensation Insurance Fund (SCIF) provides workers' compensation benefits to state employees injured on the job, including accidental injuries. The State of California accepted defendant's claim for his finger puncture but not for any potential pathogen exposure because the state does not "accept an exposure unless or until [the claimant has] some sort of infection from it." Stephanie Kofmehl, a senior claims adjuster for the state, was assigned to defendant's claim on April 26, 2014. At that time, defendant was receiving industrial disability leave (IDL), which has a higher cap and thus provides a higher paying benefit than temporary disability, because "he was taken off of work by a psychiatrist due to stress."

Kofmehl reviewed defendant's file, which first showed that he had reported to his supervisor that he had "[a]ccidentally puncture[d] his right index finger with a contaminated needle," but a latter report alleged that "he was stabbed by the inmate intentionally." Defendant's file contained reports indicating "the mechanism of injury changed" from accidental to intentional. Kofmehl observed the following: PA Harvey's June 4, 2013 treatment report noting defendant stated he was accidentally injured; the July 18, 2013, application for adjudication of claim; Dr. Pratley's[1] July 23, 2013 report indicating defendant had been stabbed in his finger by an inmate; and Drs. Flores's and Liu's 2014 reports that defendant had been attacked by an inmate and was adding a stress

---

[1] On July 19, 2013, less than five weeks after his injury, defendant changed his treating physician to Dr. Brent Pratley, an orthopedic physician.

component to his case. Kofmehl testified the change from an accidental to an intentional mechanism of injury affected the claim's monetary value because, beginning in 2013, a claimant could not receive permanent disability for a stress-related claim unless it was the result of a "violent act" and stress was originally claimed as an injury. Thus, according to Kofmehl, "based on the law, [defendant] would have no permanent disability because [his stress component] was added on," however, the state "would pay for his medical treatment to make him better."

In April 2014, when Kofmehl received defendant's file, he was still out-of-work, receiving IDL, and being treated for anxiety. After exhausting his IDL, he received another year of temporary disability. Kofmehl was concerned that defendant was out-of-work longer than expected for a puncture wound. She viewed his social media accounts, which suggested he was exaggerating the impact of his injury because they included evidence that he was working at a radio station and taking vacations. This evidence contradicted defendant's claim that "he was withdrawn from family and friends and doesn't take vacations because of [the injury]." Also, Kofmehl found it "odd" that defendant's treating physician was an orthopedist, "considering the fact that he did not have an orthopedic injury and was treating mainly for stress." She asked a SCIF attorney to "request [defendant's] deposition to determine what the actual mechanism of injury was."

On May 21, 2015, a SCIF attorney deposed defendant. Defendant testified that on June 4, 2013, while dispensing medication to a diabetic inmate, the inmate "proceeded to poke him with a syringe—or 'attack,' actually, is what he said." When defendant asked,

6

"'[W]hat you doing, man?'" the inmate responded, "'You just going to have Hep C. You're not going to have malaria like in Africa.'" Defendant added, "[W]hen he punctured me with it, I thought it was an accident. But when he answered like that, that's when I knew it was—think it was intentional. The prison guard ran to him, and then I was bleeding. I still have the mark here, and the blood was coming out. So since I knew he got Hep C, I tried to push the blood out of me, and there was a lot of blood around. And I report to my supervisor."

In 2017, special agent Kevin Oden of the Office of Internal Affairs for the Department of Corrections and Rehabilitation was assigned to investigate defendant's possible workers' compensation fraud. On August 28, 2017, after reviewing defendant's file, agent Oden spoke to Correctional Deputy Marc Escarcega and recorded their conversation. Deputy Escarcega remembered defendant leaving his station to seek medical treatment, he knew Philpott, and he stated there was no reason to write any rules violation against Philpott. The deputy added: "If staff had been assaulted, the inmate would have had a rules violation report or a 115 written up on him. And . . . after a finding that the inmate had assaulted [staff, he] would have been transferred to another prison." Agent Oden found no internal reports regarding a staff assault involving defendant.[2]

---

[2] At trial, Deputy Escarcega testified that defendant activated an alarm on June 4, 2013, and reported he had been "assaulted" or "poked by a diabetic needle during administering his diabetic needles in the pill line." During a recess, the deputy listened to the recording of his interview with agent Oden. After the recess, Deputy Escarcega testified that no alarm was activated, and he only heard defendant say, "'I got poked.'"

On August 28, 2017, agent Oden spoke to Philpott and recorded their conversation. Philpott stated he returned the dirty needle to defendant, who "put his hand inside the bucket where all the needles" were deposited, he got "poked," and he began squeezing blood out of his finger.[3] Philpott indicated that he had placed the cap on the needle after injecting himself, but defendant was "sloppy" and got pricked when he put it in the bucket. Philpott denied trying to stick defendant with a needle, noting that if he had, he would "go to the hole" and receive a rules violation, but he received no write-up or loss of privileges.

On October 18, 2017, agent Oden interviewed defendant and recorded the interview.[4] Defendant stated the inmate injected himself and then used the needle to poke him (defendant) on his right hand "pointer finger," "[c]lose to the tip." He said his coworker told him to push the blood out of his finger, and the inmate said, "'[N]othing gonna happen to you. You just gonna have Hep C. It's not like malaria in—you're not gonna have malaria like in Africa. You not gonna die from this.'" Defendant's supervisor was called, and "they sent [defendant] to US Health Works." He acknowledged that on the form he filled out at work, he wrote that he "got poked by [the inmate's] needle on the right index finger while taking the needle back from him." Defendant believed Philpott's actions were intentional based on what Philpott said after the incident; however, he did not "write the inmate up." Defendant claimed that he told his supervisor that he was attacked;

---

[3] A recording of Philpott's interview was played for the jury.

[4] A recording of defendant's interview was played for the jury.

however, he did not "recall those details, because [he] was scared." He stated he "always said that the . . . inmate attack me with . . . the needle or poke me with the . . . dirty syringe." Defendant claimed he did not know if he told PA Harvey that it was an accident, and he did not recall telling Dr. Pratley or Dr. Flores that the inmate tried to stab him in the neck. He claimed that he was unaware the law changed in 2013 to allow for a psychological claim only in the event of an attack.

Agent Oden took measurements of the medication area and filmed his attempts to reach into the medication room through the pill slot and touch another investigator who was placed where defendant would have been. Using an eyeglass case, he was unable to reach in and poke the investigator.

The defense presented testimony from several prison employees regarding disciplinary incidents involving Philpott: (1) LVN Jobe testified that on October 15, 2017, while administering medication, Philpott was yelling and screaming, "'You guys don't know how to do your job. You guys are this, you guys are that. Why didn't you open our door?'" After Philpott rushed toward the pill line and banged on the window, Jobe called an officer; (2) LVN Vargas testified that on May 13, 2018, Philpott cut in front of another patient in the pill line. When Vargas told him to go back, he got upset, and "tossed some items, . . . a lancet, a cotton ball, and an alcohol pad, onto the desk"; and (3) LVN Tabot was present when defendant got "poked by a syringe coming from the inmate." Tabot stated that after the inmate self-administered the insulin, he returned the needle, and defendant got poked. While Tabot heard the inmate apologize, he opined it was an intentional act.

9

## II. DISCUSSION

### A.    *There is Sufficient Evidence to Support Defendant's Convictions.*

Defendant contends the evidence is insufficient under Penal Code "section 1118"[5]

to show that he "*knowingly* submitted any documents that would constitute fraudulent"

insurance claims.  We disagree.

"In considering a challenge to the sufficiency of the evidence . . . , we review the

entire record in the light most favorable to the judgment to determine whether it contains

substantial evidence—that is, evidence that is reasonable, credible, and of solid value—

from which a reasonable trier of fact could find the defendant guilty beyond a reasonable

doubt.  [Citation.]  We presume every fact in support of the judgment the trier of fact

could have reasonably deduced from the evidence.  [Citation.]  If the circumstances

reasonably justify the trier of fact's findings, reversal of the judgment is not warranted

---

[5]  As respondent correctly notes, Penal Code section 1118 allows the trial court to order the entry of a judgment of acquittal in a case *tried by the court without a jury*. Since defendant's case was tried before a jury, Penal Code section 1118.1 applies.  (Pen. Code, § 1118.1 ["[i]n a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."] However, no Penal Code section 1118.1 motion was made before the trial court, and defendant primarily challenges the sufficiency of the evidence to support his convictions. In any event, we apply the same standard of review.  (*People v. Watkins* (2012) 55 Cal.4th 999, 1019 ["In considering whether the trial court erred in failing to grant the motion for judgment of acquittal under [Penal Code] section 1118.1 . . . , we ask whether 'there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged.'"], fn. 11 ["The same standard of review applies when a defendant asks the trial court to review the legal sufficiency of the evidence after the jury has returned its verdicts."].)

10

simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

Penal Code section 550, subdivision (a)(1), makes it unlawful to "[k]nowingly present or cause to be presented any false or fraudulent claim for the payment of a loss or injury, including payment of a loss or injury under a contract of insurance." Insurance Code section 1871.4, subdivision (a)(1), provides that it is unlawful to "[m]ake or cause to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation, as defined in Section 3207 of the Labor Code." As noted, defendant was charged with, and convicted of, five counts of insurance fraud. In order to establish each offense, the prosecution was required to prove that defendant *knowingly* made a false, material statement for the purpose of obtaining workers' compensation benefits. (*People v. Webb* (1999) 74 Cal.App.4th 688, 693.) A defendant acts with the required intent when he presents information, which he knows to be false, with the intent that the insurance company rely upon it to settle his claim. (*People v. Dieguez* (2001) 89 Cal.App.4th 266, 279.) "Specific intent to defraud is often proven by circumstantial evidence; it is thus typically inferred from all of the facts and circumstances." (*People v. Bollaert* (2016) 248 Cal.App.4th 699, 715.)

Here, there was no dispute defendant was injured as a result of being poked with a dirty needle. The only issue was whether the injury was accidental or the result of an intentional act by an inmate. Thus, the prosecution had to prove beyond a reasonable doubt that defendant *knowingly made a false statement* to obtain workers' compensation

11

benefits by claiming his injury resulted from an intentional act after he initially claimed it was accidental. The prosecution did so with evidence of defendant's statements, originating on the day of his injury and continuing through 2018. According to defendant's supervisor, on June 4, 2013, defendant stated he had accidentally poked himself with a used hypodermic needle after providing insulin to Philpott. If defendant had charged Philpott with intentionally poking him (defendant), Philpott would have been disciplined. However, no disciplinary actions were taken against Philpott, no staff assault report was found in his file, and Philpott confirmed that defendant had accidentally poked himself. At the urgent care center, defendant told the physician's assistant that "[h]e poked himself with a needle from a patient at his job that he gave insulin." PA Harvey's report stated defendant was accidentally injured.

Beginning in 2014, defendant claimed his injury was intentional. For example, Dr. Flores testified that on January 13, 2014, defendant said an inmate at his work had "stabbed him with the syringe when returning" it. Dr. Liu testified that on March 8, 2014, defendant stated that "he was attacked while he was working [at] the Chino Prison." In his May 21, 2015 deposition, defendant claimed he had been "'attacked'" by an inmate. On February 16, 2017, he told Dr. Flores, for the first time, that the inmate tried to stab his (defendant's) neck. Subsequently, on September 10, 2018, Dr. Flores again met with defendant; however, on this date, defendant failed to mention that the inmate tried to stab his neck, as he had previously claimed.

The above evidence demonstrates that defendant's account of how he was injured by an inmate's dirty needle changed from accidental to intentional. From this evidence, it

12

was reasonable for the jury to conclude that defendant knowingly made a false material statement for the purpose of obtaining greater workers' compensation benefits.

Notwithstanding the above, defendant maintains there is insufficient evidence to support his convictions because (1) Tabot opined the inmate intentionally poked defendant with the needle, and (2) Deputy Escarcega testified that defendant said he was "assaulted" by an inmate. We disagree. To begin with, Deputy Escarcega corrected his testimony. After listening to the recording of his interview with agent Ogden, the deputy testified he only heard defendant say, "'I got poked.'" The deputy further acknowledged that he did not know whether defendant was intentionally or accidentally poked but, if it was intentional, the incident would have been documented. Regarding nurse Tabot's opinion that the poking was intentional, the testimony of inmate Philpott, defendant's supervisor, and PA Harvey contradict that opinion. It is not our function to reweigh the evidence, reappraise the credibility of witnesses, or resolve factual conflicts, as these are functions reserved for the jury. (*People v. Albillar*, *supra*, 51 Cal.4th at pp. 59-60.) Here, the jury resolved the conflicting evidence (intentional vs. accidental injury) against defendant. The evidence amply supports the jury's decision.

B.      *The Trial Court Committed No Evidentiary Errors.*

Defendant contends the trial court made many evidentiary errors: (1) admitting evidence of a prior workers' compensation claim; (2) admitting evidence that he retained counsel for his current workers' compensation claim; (3) limiting the number of witnesses to testify about Philpott's character; and (4) admitting PA Harvey's preliminary hearing testimony through agent Oden. We find no errors. Even if we did, a reversal of

13

the judgment is not warranted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001 [erroneous evidentiary ruling does not require reversal absent a miscarriage of justice].) Given the compelling nature of the evidence against defendant, it is not reasonably probable he would have obtained a more favorable verdict absent any error, whether viewed cumulatively or singularly.

### 1. Evidence of defendant's prior workers' compensation claim.

Defendant asserts the trial court erred by admitting evidence of his prior claim for workers' compensation because it was "irrelevant to prove any disputed fact, including intent, common scheme or plan, identity, motive, plan knowledge, preparation or absence of mistake or accident, [and] therefore its admission is proscribed by Evidence Code section 1101[, subdivision](a)." He further asserts the prosecutor's "failure to disclose" the plan to introduce this evidence denied him the right to "a fair trial and proper defense." We conclude the evidence was properly admitted.

### a. Additional background information.

State claims adjuster Kofmehl testified that, by changing the mechanism of his injury from accidental to intentional, defendant increased the monetary value of his workers' compensation claim because, as of January 1, 2013, permanent disability for a stress-related claim was unavailable unless it was caused by a violent act. On cross-examination, Kofmehl stated she was unaware of any information that showed defendant was aware of this change in the law. On redirect, the prosecutor asked whether there was "anything in [Kofmehl's] file that indicated that the defendant would be aware of a change," specifically, "prior Workers' Compensation claims by" this particular

14

employee?  Kofmehl replied, "Yes."  Upon further questioning, Kofmehl testified defendant's prior claim was made before January 1, 2013, and "involve[d] an unintentional act."

When the prosecutor asked whether defendant was "paid out in that claim under all three areas of compensation that we discussed," defense counsel objected on the grounds of relevance, and the issue was discussed outside the presence of the jury.  The prosecutor argued that the evidence "goes directly to the explanation as to why the initial claim for adjudication comes in at the time it comes in without a psych claim.  That is, the defendant knew from his prior claim, hey, I get paid for psych no matter what."  The trial court agreed, finding "slight probative value."  Defense counsel replied:  "There is a prejudicial effect of the fact that he filed a prior claim.  If he's trying to prove he had knowledge of the change in the law, that's completely 100 percent irrelevant.  If it had been a side claim, that would have been different."  The prosecutor explained that it "was also a side claim, and it's referenced in the February 2017 report of Dr. Flores."  The trial court allowed "limited testimony" on the issue as follows:

"[PROSECUTOR]:  Ms. Kofmehl, we were talking about a prior claim filed by state employee Diop.  [¶]  With regard to that prior claim, did that prior claim include a psychological component for an accidental injury?

"A.  Yes.

"Q.  . . . [A]s a result of that claim, was he paid out regarding a permanent and stationary disability?

"A.  Yes."

15

The jury was instructed with CALCRIM No. 375.[6]  Following the jury's verdict, defendant moved for a new trial on the grounds, inter alia, that admission of his prior workers' compensation claim was prejudicial error, and it amounted to a violation of the discovery rules.  In opposition, the prosecutor argued that defendant's knowledge of the workers' compensation system, his intent to file an insurance claim, and his current conduct was not the result of an accident or mistake.  The trial court denied the motion.  The court pointed out that it conducted an Evidence Code section 352 analysis when defense counsel objected to the evidence, and it "believed that evidence was relevant, highly probative, and not unduly prejudicial."  The court also noted that the prosecutor had used the evidence only as a foundation for defendant's knowledge of the workers' compensation system, not to argue that "the defendant improperly or illegally filed" his prior claim.

---

[6]  "The People presented evidence of other behavior by the defendant that was not charged in this case.  That behavior including the filing of a prior workers' compensation claim in 2008 and a new workers' compensation claim involving cumulative trauma.  [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged acts.  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  [¶]  If the People have not met this burden, you must disregard this evidence entirely.  [¶] *If you decide that the defendant committed the uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether:*  [¶]  *The defendant's alleged actions were not the result of mistake or accident.*  [¶]  Do not consider this evidence for any other purpose.  [¶]  Do not conclude from this evidence that the defendant has a bad character or is disposed to commit a crime.  [¶]  If you conclude that the defendant committed the uncharged acts, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of the crimes charged.  The People must still prove each charge beyond a reasonable doubt."  (Italics added.)

16

### b.    *Applicable legal principles.*

Evidence Code section 1101, subdivision (b), allows evidence of uncharged conduct when it is relevant to prove a material fact other than criminal propensity, such as intent or the existence of a common plan or scheme.  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)  "We review a trial court's decision to admit or exclude evidence 'for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.'"  (*People v. Powell* (2018) 5 Cal.5th 921, 951.)  If the evidence of the other act is rendered admissible under Evidence Code section 1101, its admissibility "'must not contravene other policies limiting admission, such as those contained in Evidence Code section 352.'"  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404.)  Admission of other acts evidence that is relevant and not unduly prejudicial does not violate a defendant's due process or equal protection rights.  (*People v. Rhoades* (2019) 8 Cal.5th 393, 415.)

### c.    *Analysis.*

The trial court's decision to admit evidence concerning defendant's previously filed workers' compensation claim was not arbitrary, capricious, or absurd.  According to defendant, he did not "*knowingly* submit[] any documents that would constitute fraudulent" insurance claims.  Through various witnesses' testimony, defendant claimed he was intentionally poked with a dirty needle by an inmate.  When confronted with his initial claim of having been accidentally poked, he elicited testimony from Dr. Flores, who diagnosed him with PTSD, and stated defendant "could have been suffering from an

17

amnesic response," which is the inability to recall important aspects of a trauma. In response, the prosecution sought to introduce evidence of defendant's prior workers' compensation claim to show (1) his knowledge of the use of his statements to calculate benefits, and (2) that his evolving statements regarding the mechanism of his injury were not the result of an accident or mistake.

Although evidence of a prior legitimate workers' compensation claim has little probative value on the validity of the current claim, it is relevant to show a claimant's knowledge of the workers' compensation system and submission of a claim. (*Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 13 [evidence of prior workers' compensation claim relevant to worker's credibility].) Thus, the trial court weighed the applicable factors and concluded the evidence of defendant's prior claim was more probative than prejudicial. The fact that defendant previously filed for workers' compensation benefits was pertinent to explain why the manner of his injury changed from accidental to intentional. This evidence was limited in nature, did not unduly consume time, and did not inject confusing issues into the trial. Because the facts of the prior claim were never presented to the jury, it was less inflammatory than the evidence involving defendant's current claim.

Moreover, the jurors received CALCRIM No. 375, which advised them that the evidence of uncharged conduct was not enough to prove guilt, that it was only one factor to be considered, and that it could be considered for the limited purpose of determining whether defendant's "*alleged actions were not the result of mistake or accident*." (Italics added; see *People v. Barnett* (1998) 17 Cal.4th 1044, 1119 [the instruction minimized

18

any danger the jurors might rely upon the other acts' evidence for an improper purpose].)
We presume the jury understood and followed the instruction. (*People v. Smith* (2007) 40 Cal.4th 483, 517-518 ["'The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions.'"].)

Defendant also contends the prosecutor violated Penal Code section 1054.1,[7] which mandated the disclosure of "evidence relative to any prior workers' compensation claim." However, defendant's failure to object in the trial court on this ground forfeits the alleged claim of discovery error on appeal. (*People v. Anderson* (2018) 5 Cal.5th 372, 395 [defendant forfeits claim of prosecutorial misconduct by failing to object to evidence on grounds of discovery violation].) In any event, there was no discovery violation because the prosecutor disclosed the evidence before trial commenced.

> 2. *Evidence defendant retained counsel in his workers' compensation case.*

Defendant contends the trial court erred by allowing testimony that defendant exercised his fundamental right to counsel in his workers' compensation case in order to suggest culpability. As we explain, we reject this contention.

On cross-examination, defense counsel asked Kofmehl if there was "any information that was provided to [her] to show . . . that [defendant] knew of the change in the [workers' compensation] law?" She replied, "No." However, when she added, "His

---

[7] Penal Code section 1054.1, subdivision (c), in relevant part, provides: "The prosecuting attorney shall disclose to the defendant or his or her attorney all of the following materials and information, if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies: [¶] . . . [¶] (c) All relevant real evidence seized or obtained as a part of the investigation of the offenses charged."

19

attorney should have, though," defense counsel successfully objected and moved to strike her answer. On redirect, the prosecutor referenced defense counsel's question regarding defendant's knowledge of a change in the law by asking, "[W]as there anything in your file that indicated that the defendant would be aware of a change?" She replied, "Only the fact that he had an attorney, and the attorney . . . should advise him." No objection was made. "[T]he failure to raise a timely objection forfeits the claim for appeal." (*People v. Booker* (2011) 51 Cal.4th 141, 170.) Nonetheless, defendant's contention presumes a right to counsel in his workers' compensation claim case. "The Sixth Amendment right to counsel, binding on states through the Fourteenth Amendment, affords an indigent defendant facing incarceration the right to court-appointed counsel for his or her defense at every 'critical stage' of the criminal process up to and including sentencing and imposition of judgment." (*People v. Frazier* (2020) 55 Cal.App.5th 858, 864.) Defendant has not cited to—and we are unaware of—any authority that extends this right to workers' compensation cases. Absent such authority, the contention fails.

### 3. *Exclusion of cumulative defense impeachment evidence.*

Defendant claims the trial court erred by limiting the number of witnesses to testify "as to Philpott's aggressive behavior and interactions with other inmates and correctional officers at the facility" in order to show he "did not accidentally poke [defendant], but intentionally poked him." We find no error.

The prosecutor moved in limine to exclude evidence regarding Philpott's disciplinary record at Chino prison on the grounds none of the incidents involved a needle exchange, and none involved defendant. At the pretrial hearing, defense counsel

argued that the evidence regarding Philpott's administrative violations was relevant because it showed his "history of" and "a habit and a custom of" disobeying rules. In reply, the prosecutor argued the evidence was irrelevant to his credibility and did not involve threats to a nurse. Defense counsel made an offer of proof as to certain incidents involving nurses. With the exception of the October 15, 2017, incident when Philpott yelled profanities at a nurse who was administering medication, the trial court excluded evidence of the other incidents on the grounds the "probative value is substantially outweighed by undue prejudice."

At trial, the defense called LVN Jobe and LVN Vargas. Jobe testified that in October 2017, Philpott yelled and screamed that the nurses did not know how to do their job. When he rushed toward the pill line and banged on the window, Jobe called an officer. Vargas testified that in 2018, Philpott was in the pill line when he tossed items, including "a lancet, a cotton ball, and an alcohol pad."

"Under the due process guarantees of the Fourteenth Amendment to the United States Constitution, a criminal defendant has the right to testify on his or her own behalf. [Citations.] These constitutional due process guarantees include the right to present witnesses and evidence in support of a defense. [Citation.] As the high court has explained, however, these rights are 'subject to reasonable restrictions.' [Citations.] [¶] 'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense.'" (*People v. Mickel* (2016) 2 Cal.5th 181, 218.) Therefore, the trial court, exercising its discretion under Evidence Code section 352, may exclude cumulative impeachment evidence without violating the defendant's right to

present a defense. (*People v. Gurule* (2002) 28 Cal.4th 557, 619-620.) To establish a constitutional violation, the defendant must show that the impeachment evidence "'would have produced "a significantly different impression of [the witness's] credibility."'" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1251.)

Defendant has not made the required showing. He contends that evidence of Philpott's disciplinary file involving correctional officers would have established that "Philpott did not accidentally poke [him], but intentionally poked him." However, this evidence would not have impeached either defendant's supervisor or PA Harvey's testimony that defendant claimed he was accidentally injured. Nor would it have called into question the fact that no disciplinary action was taken against Philpott as a result of the incident involving defendant. The jury was made aware of Philpott's dislike of defendant, as well as Philpott's outburst toward others, including nurses, while waiting in the pill line. Testimony concerning his conflicts with correctional officers amounted to nothing more than cumulative impeachment evidence, which had minimal probative value. The trial court did not abuse its discretion in excluding it. (Evid. Code, § 352.) Moreover, any error in excluding the evidence was harmless considering defendant's initial admission to his supervisor and PA Harvey that he was accidentally injured. (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

    4.    *Admission of PA Harvey's Preliminary Hearing Testimony.*

Defendant asserts the trial court erred by allowing agent Oden to testify concerning PA Harvey's preliminary hearing testimony. He argues the evidence of

22

PA Harvey's testimony was hearsay, and the nature of the proceeding (preliminary hearing) "is completely irrelevant and only serves to prejudice the jury." We disagree.

At trial, agent Oden testified he interviewed defendant, and with the use of his deposition transcript, confronted him about his "change in the mechanism [(accidental vs. intentional)] of injury." Specifically, on June 4, 2013, defendant told his supervisor he poked himself with a dirty needle, and he told PA Harvey he was accidentally poked with a dirty needle. Later, the following exchange occurred:

"[PROSECUTOR:] And with regard to Physician's Assistant Harvey and his written statement that is in his medical report, were you also present when he testified at the preliminary hearing?

"[DEFENSE COUNSEL]: Objection, Your Honor. Relevance.

"THE COURT: Overruled. [¶] You may continue.

"[PROSECUTOR]: Were you also present at the preliminary hearing when he testified about the nature of the statements that were written in his report?

"A. Yes, I was.

"Q. And was that similar testimony as to what he testified in this case in front of this jury about the defendant's statements to him?

"A. Yes.

"[DEFENSE COUNSEL]: Objection, Your Honor. Beyond cross.

"THE COURT: Overruled. Answer will stand."

Initially, we note that defendant failed to object to the testimony on hearsay grounds. Generally, objections to evidence on the specific grounds urged on appeal must

23

be made, or the objection is forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 433-434 ["'"[D]efendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'"]; Evid. Code, § 353, subd. (a).) In any event, even if the contention was preserved for appeal, we reject it.

No preliminary hearing testimony was introduced into evidence. Rather, agent Oden only answered, "yes," to the question of whether PA Harvey's preliminary hearing testimony was consistent with his trial testimony concerning defendant's statements. Since agent Oden did not reveal or repeat PA Harvey's preliminary hearing testimony, there was no hearsay evidence. Nonetheless, assuming the evidence was hearsay, and the trial court abused its discretion in admitting it, any error was harmless. (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619 [*Watson* standard applies to the erroneous admission of hearsay evidence].) Because the evidence of defendant's guilt was strong and compelling (see discussion II.A), we conclude that it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.)

C.      *The Trial Court Properly Refused to Unseal Jurors' Identifying Information.*

Defendant contends the trial court abused its discretion by denying his request to unseal jurors' identifying information so that defense counsel could ascertain the content of conversations between members of the jury, on the one hand, and the prosecutor or agent Oden, on the other. We find no abuse of discretion.

24

*1.     Additional background information.*

The jury returned its verdict on June 7, 2019, finding defendant guilty on all charges. On August 16, defendant petitioned the court to disclose the jurors' identities (Code Civ. Proc., § 237, subd. (b)), and he moved for a new trial based on jury misconduct. In his petition, defendant alleged that his wife had observed agent Oden speak to the jury when the judge and counsel would go into chambers; but, "[a]s soon as [the judge and counsel] returned to the courtroom, the conversations immediately stopped." Also, defendant's wife "observed [the prosecutor] and [agent] Oden speaking with . . . juror #11, for approximately five (5) minutes outside of the courtroom during one of the lunch recesses." Defendant argued that these conversations "could have had a significant impact during jury deliberations." Defendant's wife submitted a declaration wherein she stated she had observed these conversations and believed that they "were inappropriate, potentially harmful and bias against [defendant] preventing him from a fair trial." She added that she was unaware "that it was against the rules for [agent] Oden to speak with jurors; otherwise, [she] would have brought it to the attention of [defendant's] attorney." Defense counsel also submitted a declaration stating that "after the conclusion of the jury trial, it was brought to [his] attention that [defendant's wife] observed [agent] Oden communicating with the jurors during the jury trial." In his motion for new trial, defendant alleged jury misconduct based on these alleged conversations between jurors and the prosecution.

25

Opposing the petition, the prosecutor argued the "alleged observations and interpretation of the defendant's wife is not sufficient to establish good cause for release of the juror's personal identifying information." The prosecutor accused defendant of "seeking permission to go [on] a fishing expedition based on a speculative account of [his] wife."

In opposition to the motion for new trial, the prosecution submitted the declarations of agent Oden and the deputy assigned to the courtroom where defendant's case was tried. Agent Oden declared that neither he nor the prosecutor spoke with any juror outside the courtroom. Inside the courtroom, he admitted that when the judge and counsel went into chambers, "jokes and comments were made by the bailiff and jurors." He recalled "a comment that something should be played on the overhead projector during the chambers conferences," and he opined that "it should be a cartoon." He also recalled jurors speaking about motorcycles, and he commented, "while riding a motorcycle, the protective turtle armor should be worn for safety." Otherwise, agent Oden denied speaking to "a juror specifically" or making any comment relating to the trial. The courtroom deputy declared that when the judge and counsel conducted a sidebar, he would "approach the Jurors and ensured they do not speak about the case"; however, he permitted "them to speak about any other topic or ask [him] questions about [his] experience as a Deputy." He recalled one occasion when agent Oden "made comments to [him] as [he] was speaking with the jurors. The comments were unrelated to the case, and [he] quickly answered him." The deputy never observed agent Oden

26

"convers[ing] with any of the jurors" and, if he had, he "would have stopped it immediately and reported it to the Judge as soon as possible."

After reviewing the petition, both sides' declarations, and the relevant case law, the trial court denied the request, stating, "The Court does not find a sufficient showing here. [Defendant's wife] herself says that she believes—and the Court will emphasize 'believes'—that the conversations she saw were inappropriate, potentially harmful, and biased. That is nothing more than speculation. There's nothing in [her] or [defense counsel's] declarations stating any evidence as to what the conversations were about. [¶] In addition, throughout the trial, the Court consistently admonished the jury to not discuss the case amongst themselves or anyone unrelated to the trial, to not form or express any opinion until the case was submitted for deliberation. There's no evidence before this Court that the jury violated this Court's order."

2. *Analysis.*

After the jury's verdict is recorded in a criminal case, personal identifying information about the jurors is sealed. (Code Civ. Proc., § 237, subd. (a)(2).) Under Code of Civil Procedure section 206, subdivision (g), "a defendant or defendant's counsel may, following the recording of a jury's verdict in a criminal proceeding, petition the court for access to personal juror identifying information within the court's records necessary for the defendant to communicate with jurors for the purpose of developing a motion for new trial or any other lawful purpose. This information consists of jurors' names, addresses, and telephone numbers." However, all requests for disclosure of juror identifying information must conform with Code of Civil Procedure

27

section 237, subdivision (b), which requires a declaration establishing good cause. "Good cause, in the context of a petition for disclosure to support a motion for a new trial based on juror misconduct, requires 'a sufficient showing to support a reasonable belief that jury misconduct occurred . . . .' [Citations.] Good cause does not exist where the allegations of jury misconduct are speculative, conclusory, vague, or unsupported." (*People v. Cook* (2015) 236 Cal.App.4th 341, 345-346.) We review the denial of a petition to disclose juror identifying information for abuse of discretion. (*Id.* at p. 346.)

Here, the trial court did not abuse its discretion in denying the petition for disclosure of juror identifying information because the declarations failed to establish good cause. Defendant's wife's declaration offers nothing more than her "belie[f]" that jurors engaged in inappropriate conversations with agent Oden. From this "belie[f]," she supposes jury misconduct prevented her husband from having a fair trial. However, her belief amounts to nothing more than pure speculation. This speculation was refuted by the declarations of agent Oden and the courtroom deputy.

D. *There Was No Sua Sponte Duty to Instruct on a Mistake of Fact Defense.*

Pointing to the testimony of Dr. Flores, nurse Tabot, and Deputy Escarcega, defendant contends the trial court prejudicially erred in failing to, sua sponte, instruct on

the defense of mistake of fact.**8** We disagree.

"""It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence"" and '"necessary for the jury's understanding of the case.""' [Citations.] It is also well settled that this duty to instruct extends to defenses 'if it appears . . . the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 73.) "If the defendant had an honest and reasonable belief in the existence of circumstances, which, if true, would make the act an innocent act, the mistake of fact defense applies. [Citation.] A mistake of fact occurs when a person understands the facts to be other than what they are. [Citation.] 'A mistake of fact exists "when one makes an erroneous perception of the facts as they actually exist. . . . The defense arises only where the defendant misperceives an objective state of existing

---

**8** CALCRIM No. 3406, the standard jury instruction for mistake of fact, provides:
"The defendant is not guilty of _____ <insert crime[*s*]> if (he/she) did not have the intent or mental state required to commit the crime because (he/she) [reasonably] did not know a fact or [reasonably and] mistakenly believed a fact.
"If the defendant's conduct would have been lawful under the facts as (he/she) [reasonably] believed them to be, (he/she) did not commit _____ <insert crime[*s*]>.
"If you find that the defendant believed that _____ <insert alleged mistaken facts> [and if you find that belief was reasonable], (he/she) did not have the specific intent or mental state required for _____ <insert crime[*s*]>.
"If you have a reasonable doubt about whether the defendant had the specific intent or mental state required for _____ <insert crime[*s*]>, you must find (him/her) not guilty of (that crime/those crimes)."

29

fact . . . .""" (*People v. Orlosky* (2015) 233 Cal.App.4th 257, 275.) Our review is de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Defendant argues the following evidence is sufficient to support the defense: (1) Dr. Flores opined that defendant suffered from PTSD, and "could have been suffering from an amnesic response," which is the inability to recall important aspects of a trauma; (2) nurse Tabot testified that he "believed that Philpott had intentionally poked [defendant] with the syringe"; and (3) Deputy Escarcega testified that, although "he observed an incident between Philpott and [defendant]," "he could not definitively say whether it was an accident or intentional." However, since the jury was tasked with determining *whether defendant knowingly made a false statement* to obtain workers' compensation benefits, it is his statements that are relevant. As the trial court correctly pointed out, what others supposed about defendant's statements is irrelevant because "[t]he question the jury had to answer was: Did the substance of defendant's story change over time? With their verdict, they found that it did." Moreover, defendant never claimed he made any mistake in his statements regarding the mechanism of his injury. Rather, he maintained the written information he provided correctly stated that he got poked, but others misinterpreted his words to mean he was accidentally poked. In other words, defendant never relied on a mistake of fact defense. Therefore, the trial court did not err in failing to instruct on mistake of fact.

E. *The Trial Court Properly Denied Defendant's Motion for New Trial.*

In his final argument, defendant challenges the denial of his motion for new trial. Our standard of review is unclear. There is authority requiring independent review of the

denial of a new trial motion to ensure a miscarriage of justice has not occurred. (See *People v. Ault* (2004) 33 Cal.4th 1250, 1260-1261, fn. 4 [listing decisions that apply the independent review to denial of new trial motion based on juror misconduct].) However, some decisions apply an abuse of discretion standard to the denial of a motion for new trial. (See, e.g., *People v. Lightsey* (2012) 54 Cal.4th 668, 729 [denial of motion for new trial based on trial court's misdirection of the jury in a matter of law or prosecutorial misconduct]; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108 [denial of motion for new trial based on evidence discovered between the guilt and penalty phases].) We need not decide which standard to apply because under either standard, we affirm the denial.

In his motion for new trial, defendant asserted the following claims of error: (1) the admission of his "prior workers' compensation claim without first giving notice to Defense"; (2) the admission of evidence that he had "retain[ed] counsel in his [current] workers' compensation claim"; (3) the admission of "statements during the preliminary hearing"; (4) jury misconduct; and (5) the "failure to give a sua sponte instruction" on mistake of fact. We have addressed each claim separately and found no error. Consequently, the trial court properly denied defendant's motion for new trial.

## III.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


McKINSTER                    
                                     Acting P. J.

We concur:



SLOUGH                    
                        J.



RAPHAEL                  
                        J.

32